UNITED STATES of America, Appellant,

v.

Nelson E. "Buck" SANFORD et al., Appellees.

No. 73–3016.

United States Court of Appeals, Ninth Circuit.

Dec. 23, 1976.

Keith L. Burrowes, Asst. U. S. Atty. (argued), Billings, Mont., for appellant.

Ralph S. Wright and D. Frank Kampfe (argued), of Sandall, Moses & Cavan, Billings, Mont., for appellees.

Before MERRILL, TRASK and SNEED, Circuit Judges.

SNEED, Circuit Judge:

This opinion marks the third time we have sought to dispose of this case. Trial on a seven-count indictment against Nelson Sanford and his sons, Rodney, Lon and Rick Sanford began on February 5, 1973. A mistrial resulted by reason of a hung jury. The district court then granted the Sanfords' motion to dismiss the indictment, and the Government appeals pursuant to 18 U.S.C. § 3731 from the grant of this motion. We originally held that this court lacked jurisdiction to hear the appeal because the double jeopardy clause prohibited further prosecution. 503 F.2d 291 (9th Cir. 1974). The Supreme Court remanded the case to us "for further consideration in the light of

*Serfass v. United States*, 420 U.S. 377, [95 S.Ct. 1055, 43 L.Ed.2d 265] (1975)." 421 U.S. 996, 95 S.Ct. 2392, 44 L.Ed.2d 663 (1975). On remand, we adhered to our prior determination. 536 F.2d 871 (9th Cir. 1976). The Supreme Court reversed, holding that the double jeopardy clause did not prohibit further prosecution, and remanded the case to us for a decision on the merits of the district court's dismissal of the indictment. —— U.S. ——, 97 S.Ct. 20, 50 L.Ed.2d 17 (1976). We reverse and remand for further proceedings on all seven counts. Because of the rather unique facts presented in this case, a full statement of the allegations set forth in the indictment is necessary. Well-pleaded factual allegations are assumed to be true.

The Sanfords are engaged in the business of outfitting and guiding big game hunts in Montana. Rodney Sanford telephoned Paul Bagalio at Bagalio's home in Vermont on December 22, 1971. During this conversation, Rodney offered his services as a guide for late season elk and Rocky Mountain Big Horn sheep hunting in Montana. A second conversation to the same effect was held on December 29 at which time the hunts at issue in this case were arranged. Subsequently, Bagalio telephoned Rodney and obtained permission to bring along Bruce Parker, who Bagalio described as "a friend and business associate."

The Sanfords were unaware that both Bagalio and Parker were acting in undercover capacities for the Bureau of Sport Fisheries and Wildlife and were authorized by federal officials to do whatever was necessary to complete their investigations.[1]

Bagalio and Parker arrived in Montana early in January 1972. On January 6, they were transported by Lon, Rick and Rodney Sanford from Bridger, Montana to Greybull, Wyoming, where they secured lodging

---

1. Although the facts as alleged in the indictment do not indicate that Bagalio and Parker were acting in undercover capacities, the Government concedes that they were authorized by federal officials "to do whatever necessary to complete their investigation." It is therefore appropriate to consider this authorization in testing the sufficiency of the indict-

ment. *See, e. g., United States v. Thompson*, 202 F.Supp. 503 (N.D.Cal., 1962). Appellees and the district court indicated that a similar authorization was made by appropriate officials of the State of Montana; however, there is no indication in the Record that the Government has stipulated the nature, scope and extent of state authorization.

for the night. The next morning, the party of five boarded a helicopter and were transported to the Crow Indian Reservation in Montana. At this time, they penetrated the boundaries of the Reservation in search of elk.[2] Parker, at the direction of Rodney Sanford, shot at and knocked down a bull elk; the *coup de grace* was administered by Rodney Sanford. Shortly thereafter, Rick Sanford returned by helicopter and transported the party and the cape of the elk from the Reservation back to Greybull, Wyoming. The cape was then carried by Lon, Rick and Rodney Sanford to Bridger, Montana. Bagalio and Parker apparently joined the Sanfords in Montana on January 10.

A second hunt was planned but first postponed because of inclement weather. The expedition finally got under way on February 2, 1972. At this time, Bagalio, Parker and Rodney Sanford again penetrated the exterior boundaries of the Crow Indian Reservation. At the direction of Rodney Sanford, Bagalio shot and killed a second elk. Rodney caped the elk, and the party, leaving the carcass behind, left the Reservation.

Within the next five days, Rodney Sanford guided Bagalio and Parker on a hunt for Rocky Mountain Big Horn sheep. Rodney led the party into Yellowstone National Park, where he pointed out a sheep for Bagalio to shoot. Bagalio shot and killed the sheep. Rodney removed the cape, head and horns from the sheep, leaving the carcass where it fell.

A seven-count indictment was returned against the Sanfords. In Count I Nelson, Rodney, Lon and Rick were charged under 18 U.S.C. §§ 2, 43, and 371 with conspiracy to transport in interstate commerce animals killed in violation of R.C.M. § 26–307(3) and 16 U.S.C. § 26. Count III charged Lon and Rodney Sanford with the January 8 illegal entry on the Crow Indian Reservation, 18 U.S.C. § 1165, and further charged Nelson and Rick Sanford with aiding and abetting the commission of the offense, 18 U.S.C. § 2. Count III charged Rodney Sanford for a similar offense with respect to the February 2 entry onto the Crow Indian Reservation; Nelson, Rick and Lon Sanford were charged with aiding and abetting this offense. Count IV charged Rodney Sanford with illegal hunting within Yellowstone National Park, 16 U.S.C. § 26. The remaining three counts concerned alleged violations of the Lacey Act, 18 U.S.C. § 43. In Count V, Rodney, Lon and Rick were charged with interstate transportation of the elk killed on January 8; the elk was said to have been killed in violation of federal, 18 U.S.C. § 1165, and state, R.C.M. § 26–307(3), laws. Count VI made the same charge against Rodney Sanford with respect to the elk killed on February 2. Finally, Count VII made an identical charge against Nelson Sanford for the transportation of parts of the bodies of the two dead elk from Billings, Montana, to Seattle, Washington; Rodney, Lon and Rick Sanford were charged with aiding and abetting the commission of this offense.

Our consideration of the sufficiency of the indictment will focus: first, on Counts II and III, relating to the alleged trespass on the Crow Indian Reservation; second, on Counts V, VI and VII, relating to the alleged violations of the Lacey Act; third, on Count IV, relating to hunting within Yellowstone National Park; and, fourth, on Count I, relating to conspiracy to transport illegally killed animals in interstate commerce.

*Counts II and III: Trespass on Crow Indian Reservation.*

Turning to the portions of the indictment charging appellees with illegal trespass on the Crow Indian Reservation, 18 U.S.C. § 1165 proscribes unauthorized entry onto an Indian reservation *for the purpose of* hunting, trapping, or removal of game.[3]

---

**2.** Rick, who had left in the helicopter, and Nelson Sanford were not with the party.

**3.** "Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe . . . and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States

The district court dismissed Counts II and III on the ground that the trespass was effectively authorized by Bagalio and Parker. We disagree.

We need not pass on the authority of the federal agents to enter the Crow Reservation under the facts alleged in this case, for even assuming that the entry of Bagalio and Parker was lawful, we find nothing in these facts which would warrant a conclusion either that the agents could lawfully authorize appellees to enter the Reservation or that in fact such authorization was given. The facts as set forth in the indictment suggest that the Sanfords were the prime motivating force in the entry and that Bagalio and Parker did little more than follow the instructions of their guides. The participation of the undercover agents in the adventure does not, as the district court suggests, constitute an authorization nor in any other manner make lawful what would otherwise be an unlawful trespass by appellees. *See United States v. Gonzales*, 539 F.2d 1238 (9th Cir. 1976).

■ We are also unable to accept the argument that 18 U.S.C. § 1165 does not extend to the activities of guides, who presumably are not actively engaged in the shooting of animals. On the contrary, the statute is written in the broadest possible terms and was designed to prevent encroachments on Indian lands of the type presented in this case. It would clearly violate the intent of Congress to read the statute as not governing the entries of hunting guides.

*Counts V, VI and VII: Interstate Transportation of Animals Killed in Violation of Federal and State Law.*

Appellees are charged under the Lacey Act, 18 U.S.C. § 43, with three counts of interstate transportation of illegally killed animals: Count V charges Rodney, Lon and Rick Sanford with interstate transportation of "parts of the dead elk killed on January 8, 1972; Count VI charges Rodney Sanford with interstate transportation of "parts of the dead elk killed on February 2, 1972; Count VII charges Nelson Sanford with interstate transportation of the above from Billings, Montana to Seattle, Washington, and further charges the remaining Sanfords with aiding and abetting the transportation.[4]

The Lacey Act proscribes the transportation of wildlife killed in violation of federal laws and the interstate transportation of wildlife killed in violation of state laws.[5] Thus, the inquiry under this portion of the indictment is directed to whether the elk which were transported were killed in violation of either federal or state laws.

■ To establish an illegal killing under federal law, the Government urges that 18 U.S.C. § 1165 makes illegal the unauthorized killing of wildlife on Indian reservations. We disagree and find persuasive the reasoning of the Montana Supreme Court:

that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited." 18 U.S.C. § 1165.

4. No Lacey Act charges are made with respect to the Rocky Mountain Big Horn sheep killed in Yellowstone National Park.

5. 18 U.S.C. § 43 provides, *inter alia:*
 (a) Any person who—
 (1) delivers, carries, transports, or ships, by any means whatever, or causes to be delivered, carried, transported, or shipped for commercial or noncommercial purposes or sells or causes to be sold any wildlife taken,

transported, or sold in any manner in violation of any Act of Congress or regulation issued thereunder, or (2) delivers, carries, transports, or ships, by any means whatever, or causes to be delivered, carried, transported, or shipped for commercial or noncommercial purposes or sells or causes to be sold in interstate or foreign commerce any wildlife taken, transported, or sold in any manner in violation of any law or regulation of any State or foreign country; . . .
 (f) For the purpose of this section, the term
. . .
 (5) "taken" means captured, killed, collected, or otherwise possessed.

It is significant to note that section 1165 does not directly prohibit hunting and fishing but makes the act of going upon the Indian reservation a violation if done for the purpose of hunting or fishing . . . [S]ection 1165 must be considered to be a statute providing a penalty for trespass to an Indian reservation and not an attempt by Congress to enter the field of fish and game regulation. *State v. Danielson,* Mont., 427 P.2d 689, 691 (1967).

■ Turning to state law, the Government also argues that the elk were killed in violation of the Montana fish and game law, R.C.M. § 26–307(3). This, of course raises the preliminary issue of whether the Montana game laws apply to the activities of non-Indians on Indian reservations. We hold that they do. In reaching this determination, *we again accept as a correct statement of the law* the decision of the Montana Supreme Court in *State v. Danielson, supra,* wherein it was noted that:

[T]he State of Montana has jurisdiction to enforce its fish and game regulations on Indian reservations contained within its boundaries with respect to persons who are not tribal Indians unless precluded from doing so by an act of Congress or unless such enforcement would interfere with self-government on the reservation. 427 P.2d at 692–93.

As mentioned above, 18 U.S.C. § 1165 does not represent an attempt by the federal government to enter the arena of fish and game regulation on Indian reservations; thus, the federal statute cannot be viewed as a prohibiting or conflicting act. Further, we are convinced that the application of Montana game laws to the activities of non-Indians on Indian reservations does not interfere with tribal self-government on reservations. We express no opinion concerning the possible concurrent application of tribal law to non-Indians on Indian reservations under the circumstances of this case.

■ Having determined that the Montana game laws are applicable, the issue becomes whether the elk were killed in violation of R.C.M. § 26–307(3),[6] which provides:

It shall be unlawful and a misdemeanor for any person during the closed season on any species of game animal, game bird or fish to take, hunt, shoot, kill or capture any such game animal or such game bird or to fish for or catch any such fish.

Turning first to the activities of appellees, it is our view that R.C.M. § 26–307(3) was not designed to reach the activities of hunting guides. We reach this conclusion because of the existence of a separate provision of the Montana Code, R.C.M. § 26–906, dealing specifically with activities of outfitters and guides. This section provides:

Any person accompanying a hunting or fishing party as an outfitter or agent or employee of such outfitter shall be equally responsible with any person or party employing him as an outfitter for any violation of the law; any such outfitter or employee of such outfitter, who shall willfully fail to or refuse to report any violation of the law, shall be liable to the penalties as herein provided.

The definition of "outfitter" offered in R.C.M. § 26–904[7] makes it clear that the

---

6. In neither its briefs nor during oral argument did the Government choose to argue that other provisions of the Montana fish and game laws may be applicable to the activities of the Sanfords. Thus, although Federal Rule of Criminal Procedure 7(c)(3) provides that omission of a statutory citation is not *per se* grounds for dismissal of the indictment, we decline to review the Montana Code in a search for possible violations when the Government places sole reliance on R.C.M. § 26–307(3).

7. R.C.M. § 26–904 defines "outfitter" as follows:

For the purpose of this act, the word 'outfitter' shall mean any person . . . who *shall engage in the business of outfitting for* hunting or fishing parties, as the term is commonly understood, who shall for consideration provide any saddle or pack animal or animals or personal service for hunting or fishing parties, camping equipment, vehicles *or other conveyance except boats* for any person or persons to hunt, trap, capture, take or kill any game, . . . or who shall aid

Government is incorrect in its contention that the Sanfords engaged in off-season hunting within the meaning of R.C.M. § 26–307(3). Thus, the indictment fails to allege facts sufficient to establish a violation of R.C.M. § 26–307(3) by the Sanfords.

 But this does not end the inquiry, for if it is established that Bagalio and Parker violated R.C.M. § 26–307(3), then the violation of state law necessary for a Lacey Act prosecution will be established.[8] The issue is thus narrowed to a consideration of whether Bagalio and Parker were lawfully and properly authorized by state officials to kill the elk in question;[9] if such authorization is present, then R.C.M. § 26–307(3) was not violated and the Lacey Act counts of the indictment must be dismissed for failure to establish a violation of state law. Authorization by federal officials will not serve as authorization by state officials. This follows from the fact that Congress has not attempted to enact game laws for Indian reservations in Montana. Under these circumstances federal authorization cannot immunize federal officials from the force and effect of Montana game laws.

While the indictment is silent on the question of state and federal authorizations in this case, the Government has conceded the extent of federal authorization, but no similar stipulation has been made with respect to state authorization. Thus, remand on the Lacey Act counts of the indictment is necessary. If on remand it is determined that state authorization was lawfully effected, Counts V, VI and VII should be dismissed.

*Count IV: Hunting in Yellowstone National Park.*

 Rodney Sanford is charged with illegal hunting of Rocky Mountain Big Horn sheep within the confines of Yellowstone National Park. 16 U.S.C. § 26 provides, *inter alia:*

> All hunting, or the killing, wounding, or capturing at any time of any bird or wild animal, except dangerous animals, when it is necessary to prevent them from destroying human life or inflicting an injury, is prohibited within the limits of said park; . . . .

The parties devoted considerable attention in their briefs and during oral arguments to the issue of whether Bagalio acted lawfully in shooting and killing the sheep. In our view, this is a misstatement of the issue; the appropriate inquiry is instead whether the language "all hunting, or the killing, wounding, or capturing . . . of any bird or wild animal" encompasses the activities of Rodney Sanford within Yellowstone Park. More particularly, the issue is whether 16 U.S.C. § 26 covers the activities

---

or assist any person or persons in locating or pursuing any game animal.

8. Under the circumstances here presented, the commission of the state law violation by undercover agents does not change the result. The extent of the state involvement in the crimes does not rise to the outrageous level contemplated in *Hampton v. United States,* 425 U.S. 484, 491, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113; (Powell, J., concurring); *id.* 425 U.S. 484, 495, 96 S.Ct. 1646, 1652, (Brennan, J., dissenting) and consequently does not violate due process. The case is analogous to those in which the Government agents supply contraband to an ongoing criminal enterprise. "[S]uch conduct falls well within the bounds sanctioned by the Supreme Court in *Hampton.*" *United v. Gonzales-Benitez,* 537 F.2d 1051 (9th Cir. 1976). *Compare Greene v. United States,* 454 F.2d 783 (9th Cir. 1971).

9. We are aware of no Montana cases holding that authorization by proper state officials may vitiate what would otherwise be an illegal killing by state agents acting in undercover capacities. The Montana Fish and Game Commission is, however, vested with the responsibility of supervising fish and wildlife within the state. The broad responsibilities given to the Commission include the power to enforce the game laws of the state, R.C.M. § 26–104(2), fix general and special seasons and bag limits, R.C.M. § 26–104.3, and establish game refuges, R.C.M. § 26–104.8. Most importantly, the Commission "possesses all powers necessary to fulfill the duties prescribed by law." R.C.M. § 26-104(1). Although the Commission has not been granted express authority to create special exceptions for law enforcement purposes, the broad powers enumerated above strongly suggest that it may authorize limited off-season shootings by government officials if essential to the performance of a legitimate law enforcement function.

of hunting guides as well as hunters themselves.[10] We hold that it does.

We begin our consideration by noting the broad language of 16 U.S.C. § 26, which clearly proscribes two sets of activities: (1) hunting; and (2) killing, wounding, or capturing of animals. Rodney Sanford neither killed, wounded nor captured the sheep; the inquiry is thus whether he "hunted" within the meaning of the statute. It is our view that, given the broad wording and purposes of the statute, the term "hunting" refers to at least two types of activities. The first of these, which is not applicable to the activities of Rodney Sanford, may be generally referred to as abortive attempts to kill, wound or capture animals. This would, for example, include the situation where park officials interrupted the hunt prior to the actual shooting of game. "Hunting," however, may also include the search for and pursuit of game. *Compare, e. g., State v. Meinken,* 10 N.J. 348, 91 A.2d 721 (1952). It is this aspect of "hunting" which has special applicability to the activities of Rodney Sanford. Prior to the point in time at which game is located, the guide is the member of the party most directly concerned with the search for and pursuit of game; it is for these services that he receives his compensation and it is this type of activity which 16 U.S.C. § 26 was designed to proscribe.

We are untroubled by what may be viewed as a superficial inconsistency between our interpretation of R.C.M. § 26–307(3) and 16 U.S.C. § 26. It will be recalled that our relatively narrow reading of the Montana provision was influenced by a separate provision of the state fish and game laws dealing with the activities of outfitters and guides. We again emphasize that the Montana Code is quite specific in its regulation of fish and game; for example, separate provisions deal with the activi-

ties of outfitters, R.C.M. §§ 26–904, 906, the use of aircraft to locate game, R.C.M. § 26–301, subd. 2, tagging of game, R.C.M. § 26–202.2(3) and the waste of game, R.C.M. § 26–307(1). We held only that the Government's sole reliance on R.C.M. § 26–307(3) to establish a violation of state law was misplaced. In contrast with the specificity of the Montana Code, the federal statute is general and all-inclusive in nature. To read the federal statute as excluding the activities of hunting guides would defeat the obvious Congressional intention to preserve wildlife within Yellowstone National Park. It is this distinction which explains our differing treatment of the state and federal statutes.

*Count I: Conspiracy to Transport Illegally-Killed Animals in Interstate Commerce.*

Count I of the indictment charges appellees with conspiracy to transport in interstate commerce parts of the dead bodies of the two elk and the sheep. The district court dismissed this count on the ground that appellees cannot be charged with conspiracy to commit a substantive crime when the scheme, if completed, does not constitute an offense against the United States. We disagree. Apart from the ultimate disposition of the substantive counts of the indictment charging interstate transportation of illegally killed animals, "the crime of conspiracy is complete upon the agreement to violate the law, as implemented by one or more overt acts . . ., and is not at all dependent upon the ultimate success or failure of the planned scheme." *United States v. Thompson,* 493 F.2d 305, 310 (9th Cir.), *cert. denied,* 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). *See also Craven v. United States,* 22 F.2d 605, 609 (1st Cir. 1927), *cert. denied,* 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739

10. Appellants again argue that authorization from proper federal officials vitiates what would otherwise be illegal acts. Again, we must disagree. There is nothing in the facts alleged in the indictment which even remotely suggests that the authorization, if it existed, extended to the activities of Rodney Sanford.

Nor may there be said to be an implied authorization extending from Bagalio and Parker to Rodney Sanford, for, as we noted above, the mere presence of undercover agents does not vitiate what would otherwise be illegal conduct.

(1928). The Sanfords allegedly believed that Bagalio and Parker were bona fide hunters; it follows therefrom that they conspired to violate those laws that would have been violated had their assumption been correct. Ample overt acts exist and it is not necessary that these overt acts be criminal in nature. *See United States v. Rabinowich,* 238 U.S. 78, 86–88, 35 S.Ct. 682, 59 L.Ed. 1211 (1915). The facts alleged in the indictment, if proven, would establish a conspiracy under 18 U.S.C. § 371.

We therefore reverse and remand for further proceedings on all counts of the indictment.