457 F.Supp. 599 (1978)
The UNITED STATES of America, in its own right and as fiduciary on behalf of the Crow Tribe of Indians and the Crow Tribe of Indians, as intervenors, Plaintiffs,
v.
The STATE OF MONTANA, Montana State Fish and Game Commission, Willis B. Jones, Arnold Rieder, Arthur C. Hagenston, Joseph J. Klabunde, W. Leslie Pengelly, Wesley R. Woodgerd, and Big Horn Rod and Gun Club and Citizens' Rights Organization, as intervenors, Defendants.
The STATE OF MONTANA, Montana State Fish and Game Commission, Willis B. Jones, Arnold Rieder, Arthur C. Hagenston, Joseph J. Klabunde, W. Leslie Pengelly, and Wesley R. Woodgerd, on behalf of themselves and on behalf of the citizens of the State of Montana and of the United States of America and the public and as representatives of all non-Crow Indian owners of real property within the Crow Indian Reservation, and Big Horn Rod and Gun Club, and Citizens' Rights Organization, as intervenors, Cross-Claimants,
v.
The UNITED STATES of America, in its own right and as fiduciary of the Crow Tribe of Indians, and the Crow Tribe of Indians, Cross-Defendants.
No. CV-75-105-BLG.
United States District Court, D. Montana, Billings Division.
July 31, 1978.
*600 Steven E. Carroll, Dept. of Justice, Washington, D.C., for The United States.
Thomas J. Lynaugh, Thomas K. Schoppert, Lynaugh, Fitzgerald, Schoppert, Skaggs & Essman, Billings, Mont., R. Anthony Rogers, Charles A. Hobbs, Wilkinson, Cragun & Barker, Washington, D.C., for Crow Tribe of Indians.
Michael Greely, Atty. Gen., Helena, Mont., Urban L. Roth, Sp. Asst. Atty. Gen., Butte, Mont., for the State of Montana.
Clayton R. Herron, Sp. Asst. Atty. Gen., Helena, Mont., for Fish and Game Commission.
Bert W. Kronmiller, James E. Seykora, Hardin, Mont., for Big Horn Rod and Gun Club.
Douglas Y. Freeman, Hardin, Mont., for Citizens' Rights Organization.

OPINION
BATTIN, District Judge.
This case seeks to quiet title to the bed and banks of the Big Horn River. A corollary issue requires a determination of whether the State of Montana has the authority to regulate hunting and fishing within the exterior boundaries of the Crow Indian Reservation by non-Indian persons, since the Crow Tribe purportedly has an exclusive treaty right to reservation hunting and fishing. The final issue is whether the State of Montana, acting through the auspices of the State Fish and Game Department, is lawfully asserting authority to regulate hunting and fishing by non-Indian persons within the exterior boundaries of the Crow Indian Reservation.
The case was tried before the Court, sitting without a jury, on June 27, 1978. An extensive and laudatory record has been made. The Court, having considered the evidence adduced at trial, the testimony of the witnesses, and the exhaustive legal arguments presented by counsel for each of the parties, finds as follows:
(1) That the State of Montana owns the bed and banks of the Big Horn River and that the same are not held in trust by the United States of America for the use and benefit of the Crow Tribe of Indians. United States v. Finch, D.C., 395 F.Supp. 205 (1975);[1]
*601 (2) The State of Montana has authority to regulate hunting and fishing, by non-Indians on the Crow Indian Reservation, and Montana's fish and game laws apply to such persons. United States v. Sanford, 547 F.2d 1085, 1089 (9th Cir. 1976);[2] and
(3) The State of Montana is properly acting within its power and authority in regulating hunting and fishing by non-Indian persons within the exterior boundaries of the Crow Indian Reservation.

I. JURISDICTION
Subject matter jurisdiction over this cause exists in the District Court by virtue of 28 U.S.C. §§ 1345 and 1362. Venue is proper, as all the defendants reside within the District. A case or controversy exists between each of the plaintiffs and each of the defendants as to the title to the bed and banks of the Big Horn River to the high water mark and as to which governmental entity has authority to regulate hunting and fishing within the exterior boundaries of the Reservation. The plaintiffs have no adequate remedy at law and are entitled to bring this action for declaratory relief.

II. FACTS
The history and negotiations of the treaties which are considered in this action were discussed in detail by the Court of Claims in the case of the Crow Tribe of Indians v. United States, 284 F.2d 361, 151 Ct.Cl. 281 (1960); Crow Nation v. United States, 81 Ct.Cl. 238 (1935); and Fort Berthold Tribe of Indians v. United States, 71 Ct.Cl. 308 (1930). Thus, it is unnecessary to elaborately discuss the treaty background and the history need not exhaustively be repeated here. It is necessary as a preliminary matter to extract from the record the factual basis upon which the Court has determined the ownership of the bed and banks of the Big Horn River.
The present Crow Indian Reservation is part of a large tract recognized as Crow lands by the Treaty of Fort Laramie of 1851, 11 Stat. 749, 2 C. Kappler, Indian Affairs: Laws and Treaties 594 (hereinafter cited as "Kapp."). The treaty with the Crows of 1868, 15 Stat. 649, 2 Kapp. 1008, carved out from the 1851 territory a reservation of some 8,000,000 acres for the Crow Indians. The Reservation was further diminished in size by subsequent Acts of the Congress, see, 22 Stat. 42 (1882); 26 Stat. 989 (1891); 33 Stat. 352 (1904); 50 Stat. 884 (1937).[3]
The Big Horn River is a navigable watercourse which traverses the heart of the Crow Indian Reservation from south to north. Prior to 1851, the United States owned the bed of the Big Horn River. The United States retained the ownership of the bed of the Big Horn River as public lands, during the time it entered into the treaties with the Crow Nation. Because it so retained the bed, the bed and the river passed to the State of Montana upon Montana's admission to the Union.
*602 The Crow Tribe of Indians is not indigenous historically to either Montana or Wyoming. The roots of this nomadic people were formed in Canada near the Winnepeg Lake area. Initially, migration took the Crow, also known as the Absorkas, to an area on the Missouri River now encompassed by the Dakotas, where the Crow joined the Mandan. Ultimately, the Crow and the Mandan quarreled and the Crow once again migrated until their meandering was impeded by the main range of the Rocky Mountains. The later migration of the Crow Nation occurred around the time the dominant society was migrating from the old world to the new world. The Crow occupancy of the land now constituting the Crow Indian Reservation is not based upon aboriginal title from time immemorial.
While the Crow Indians did not have a written language, an extensive vocabulary did exist. The language had words for hunting, fishing, elk, deer, trout, and other types of animals and fish. The language was sophisticated in the sense that significant semantical distinctions existed. The vocabulary distinguished between "rights" and "privileges".
The Crow Nation was largely dependent upon big game animals or agriculture for subsistence. The first written reference to fishing and the Crow Indians came about at a council meeting between the Crow Tribe and the Federal Government, which resulted in a further cession of the Reservation. Act of April 11, 1882, 22 Stat. 42. The evidence adduced at trial indicates that fishing was not a central part of the Crow diet. The Crow were not dependent upon canoes or other types of boats for transportation along the Big Horn River or other rivers and streams flowing through their country.

III. TREATIES
The first contact the United States recorded in its relations with the Crow resulted in the Treaty of Friendship with the Crow Tribe in 1825. 7 Stat. 266. That treaty made no reservations of land to the Crow.
The next treaty was approved by the Senate on May 24, 1852, but is referred to as the Treaty of 1851. The Crow did not assent to this treaty until September 18, 1854.[4] The Treaty of Fort Laramie created a reservation encompassing some 38,531,174 acres. After the Treaty of Fort Laramie, the inevitable course of reservation diminishment followed.
On May 7, 1868, the Second Treaty of Fort Laramie was signed and proclaimed by the President on August 12, 1868. 15 Stat. 649. The Treaty diminished the reservation by over 30,000,000 acres. The net result of the 1868 Treaty was a reservation to the Crow of approximately 8,000,000 acres. Subsequent Congressional Acts reduced the size of the Crow Reservation to its present acreage of approximately 2,282,764.0 acres.[5] Of the 2,282,764 acres of reservation land that remain, the ownership can be broken down as follows:

 Percentage of
 Type of Ownership to
Ownership Acreage Total Acreage
Allotted 1,187,592.34 52.02%
Tribal 379,740.64 16.64%
(Surveyed)
Tribal 15,850.85 .69%
(Unsurveyed)
Government Owned 1,400.50 .07%
Yellowtail Dam 6,695.64 .29%
State Lands 44,804.82 1.96%
Fee Lands 646,679.12 28.33%
 ____________ _______
TOTAL: 2,282,764.00 100.00%

The only reference the 1851 Treaty makes to hunting and fishing is in Article 5, which provided that the eight Indian nations "do not surrender the privilege of *603 hunting, fishing, or passing over any of the tracts of country heretofore described." (Emphasis supplied.) Likewise, the Treaty of 1868 makes but one reference to hunting and fishing rights. That is in Article 4 of the Treaty of 1868. Neither the Treaty of Fort Laramie of 1851 nor the Treaty of the Crow Indians of 1868 made specific reference to the title of the Big Horn River and its bed.
Article 1 of the Treaty of 1868 provided: If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained. If bad men among the Indians shall commit a wrong or deprivation upon the person or property of anyone, white, black, or Indian, subject to the authority of the United States and at peace therewith, the Indians herein named solemnly agree that they will, and proof made to their agent and noticed by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws; . . .
The reservation was described in Article 2 as that place "set apart for the absolute and undisturbed use and occupation of the Indians." Article 4 of the Treaty provides the touchstone for the claims of the Crow Tribe. It references the rights of the Indians in that they "shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and as long as peace subsists among the whites and Indians on the borders of the hunting districts."

IV. STATUTES
The General Allotment Act of 1887 and the Crow Allotment Act of 1920 specifically provided that patents in fee could be issued by the United States to allottees within the Crow Indian Reservation and thus be subject to alienation to non-Indians. This provision exists despite the language of Article 2 of the 1868 Treaty, which provided:
No persons, except those herein designated and authorized so to do, and except such officers, agents, and employees of the Government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians, and henceforth, they will, and do hereby, relinquish all title, claim or rights in and to any portion of the territory of the United States, except such as is embraced within the limits aforesaid, . . .
An examination of the treaties together with the relevant statutes reveals the vacillating policy of the United States, evident at the time.[6] The allotment system was intended to integrate the Indian into the white communities and was unilaterally imposed upon the Crow. This integration purpose is apparent in the Crow Allotment Act of 1920.[7] The Crow territory was part of the Louisiana Purchase. Both the Courts and the Congress have recognized that the object of the Louisiana Treaty was to acquire land for the formation of new states.[8] The Nebraska Territory was created on May 30, 1854, and the Crow cession in the present state of Montana was included in the Dakota Territory, carved out of the *604 Nebraska Territory on March 1, 1861. Thereafter, the Territory of Idaho was created from Eastern Washington and Western Dakota and included all of the land which now constitutes Montana. On January 16, 1864, the Territory of Idaho established what are presently the Montana counties of Missoula, Deer Lodge, Dawson, Beaverhead, Madison, Jefferson, Choteau, and Big Horn. These counties were immediately adopted as Montana counties at the Territorial Assembly at Bannock on December 12, 1864. The Territorial Government, meeting after the creation of the Montana Territory, adopted the acts of the Idaho Territorial Legislature. Although the Congress nullified the original acts, they were recreated by the Legislature of 1867. Thus, on the date of May 7, 1868, the date of the Treaty of the Crow Cession, the Territory of Montana was located in Big Horn, Gallatin, Meagher, and Musselshell Counties.
The Organic Act of the Territory of Montana provided:
That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said territory so long as such rights remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribes, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the territory of Montana, until said tribe shall signify their assent to the president of the United States to be included within said territory, or to affect the authority of the government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent for the government to make if this act had never passed.
Act of May 26, 1864, 13 Stat. 85.
Neither the Treaty of 1851, nor the Treaty of 1868 conferred upon the Tribe the right to exclude the Crow Reservation from the Montana Territory.
Montana's Enabling Act substantially changed the language of the Organic Act of the Territory:
That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; . . .
Act of February 22, 1889, 25 Stat. 676.

V. FISH AND GAME MANAGEMENT
On March 27, 1970, the Crow Tribe and the Bureau of Sports Fisheries and Wildlife, a federal agency, entered an agreement which provided that the Bureau would give technical assistance in the management of fishing resources on the Crow Reservation and would stock the waters of the Big Horn River and the Big Horn Canyon Recreation Area. To assist in the implementation of this plan, the Crow Tribal Council on June 20, 1970, enacted Resolution No. 70-51, which directed the Tribal officers to enter the agreement with the Bureau of Sports Fisheries and Wildlife "for the purpose of providing the Crow Tribe with fish and wildlife and the planting stock required . . .."[9] The Fisheries management by the United States Fish and Wildlife Service actually began on the Crow Reservation in 1964. However, a Fisheries biologist was not assigned to the reservation area until 1973, when management assistance was provided to three eastern Montana Indian *605 reservations with special emphasis on the Crow Reservation.
On the other hand, the State of Montana has, since at least 1928, engaged in an extensive fish-stocking program throughout the waters of the Crow Indian Reservation. The plantings started in 1928 and continued up to the present time. Additionally, the State Department of Fish and Game has conducted extensive game, fishery and fowl studies on the Big Horn River without objection by either the Tribe or the Bureau of Indian Affairs. The Montana Department of Fish and Game introduced the Brown and the Rainbow Trout to the Big Horn, the Little Big Horn, and other reservation streams.
The reservation is a haven for upland gamebirds. The ringnecked pheasant, wild turkey, and Hungarian partridge, none of them indigenous to the area, were introduced by either non-Indian organizations or the Montana Department of Fish and Game. The State Department has also stocked game animals in areas adjacent to the reservation, these animals having migrated to the tribal mountain areas where they have been hunted and killed by Indian hunters.
This factual background does not substantiate either directly or by negative inference the claims of the Crow Tribe that it owns the Big Horn River and has power and authority to regulate hunting and fishing by non-Indians on reservation lands. Significantly, neither of the treaties considered contains an express grant of all land including the beds of navigable streams contained within the territorial boundaries of the land in question.

VI. DISCUSSION

A. The River.

The first determination which must be made is whether the bed of the Big Horn River, within the exterior boundaries of the Crow Indian Reservation, is land held by the United States in trust for the use and benefit of the Crow Tribe, or whether it is land to which the title passed to the State of Montana upon its admission to the Union. As has been previously noted, the Big Horn River is a navigable watercourse which flows through the Crow Reservation from south to north. The United States either transferred beneficial ownership of the bed to the Crow Tribe by the Treaties of 1851 and 1868, or it retained ownership of the bed as public lands which passed to the State of Montana upon its admission to the Union. Choctaw Nation v. Oklahoma, 397 U.S. 620, 627-628, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1969).
The disposition of this case depends upon which alternative the Government followed when it signed the treaties. The analysis of this issue must be presented in the context of, and is controlled by, the opinions of the United States Supreme Court in two cases ruling on the title to lands underlying navigable waters situated in Indian territory: United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926), and Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1969). The application of these precedents requires a delicate balance.
Early on, it was determined that a disposition by the United States of public lands bordering upon navigable waters, as a general rule, does not convey title or dominion to the land situated below high water mark. Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1893). In Shively, the United States had granted land adjacent to the Columbia River to a private party pursuant to the Oregon Donation Act, 9 Stat. 496. The Supreme Court held that absent the clearest expression of the intent to the contrary, it would not presume that the United States intended to divest itself of part of the river bed. The Court stated:
The United States, while they hold the country as a territory, having all the powers both of national and of municipal government, may grant, for appropriate purposes, titles or rights in the soil below high-water mark of tide waters. But they have never done so by general laws; and, unless in some case of international duty or public exigency, have acted upon *606 the policy, as most in accordance with the interest of the people and with the object for which the territories were acquired, of leaving the administration and disposition of the sovereign rights in navigable waters, and in the soil under them, to the control of the states, respectively, when organized and admitted into the Union. Shively v. Bowlby, 152 U.S. at 58, 14 S.Ct. at 569.
The principle enunciated in Shively, supra, was applied to transfers of land involving Indian tribes by the Supreme Court in the case of United States v. Holt State Bank, supra.
In Holt State Bank, the dispute concerned ownership of the bed of Mud Lake, a body of water lying wholly within the exterior boundaries of the Red Lake Indian Reservation in Minnesota. By treaties enacted before Minnesota was admitted into the Union, the government had recognized the right of the Chippewa Indians to occupy the reservation. When the treaties were signed, Mud Lake was a navigable body of water. The last treaties preceding Minnesota's statehood were concluded September 30, 1854, 10 Stat. 1109, 2 Kapp. 648, and February 22, 1855, 10 Stat. 1165, 2 Kapp. 685. There was nothing in the language of the treaties, or in the background of treaty negotiations, which prompted the Court to find an express intent by the United States to dispose of the land underlying the lake. Both the Treaty of 1854 and the Treaty of 1855 provided for the cession by the Chippewa to the United States of their claimed aboriginal right to occupy certain lands. In return for that cession, the government recognized that the Chippewa had rights in the land constituting the reservation. By the Treaty of 1854, the United States did state that certain tracts of land would be "set apart and withheld from sale, for the use of the Chippewa," Article 2, 2 Kapp. 648; and the Treaty of 1855 provided that a sufficient quantity of land "be reserved and set apart . . . for the permanent home of the said Indians" within designated locations. Article 2, 2 Kapp. 685, 686. However, there was no express provision guaranteeing to the Indians exclusive possession of the tracts in either treaty. Equally significant, there were no assurances given by the United States that the lands would ever be put to any other use. The Supreme Court noted the effect of the treaties in finding that
[t]here was no formal setting apart of what was not ceded, nor any affirmative declaration of the rights of the Indians therein, nor any attempted exclusion of others from the use of navigable waters. The effect of what was done was to reserve in a general way for the continued occupation of the Indians what remained of their aboriginal territory; and thus it came to be known and recognized as a reservation. Minnesota v. Hitchcock, 185 U.S. 373, 389 [22 S.Ct. 650, 46 L.Ed. 954]. There was nothing in this which even approaches a grant of rights in lands underlying navigable waters; nor anything evincing a purpose to depart from the established policy, before stated, of treating such lands as held for the benefit of the future State.

United States v. Holt State Bank, 270 U.S. at 58-59, 46 S.Ct. at 200.
The Court followed the rule announced in Shively and held that title to and dominion of the lake bed remained vested in the national government and that ownership of the bed passed to the State of Minnesota on its admission to the Union.
The second principal authority which establishes the dichotomy considered here is the case of Choctaw Nation v. Oklahoma, supra. The Court in Choctaw Nation addressed an issue similar to that raised by the Holt State Bank case. After examining treaty grants made under different circumstances in Choctaw Nation, the Court reached a different conclusion as to the ownership of lands underlying navigable waters of the Arkansas River.
A series of treaties had provided for the relocation of the Choctaw and Cherokee Tribes, but the lands therein set aside were settled before the Indians could be relocated. Even so, the national and state governments exerted pressure on the Indians to move when voluntary removal failed.

*607 As a guarantee that they would not again be forced to move, the United States promised to convey that land to the Choctaw Nation in fee simple "to inure to them while they shall exist as a nation and live on it."

Choctaw Nation v. Oklahoma, 397 U.S. at 625, 90 S.Ct. at 1331.
Similar promises were made to the Cherokee. The Holt State Bank case was found to be inapplicable to the Choctaw Nation facts, and the Court accordingly held that the bed of the Arkansas River was held by the Indian tribes. The decision in Cherokee Nation was based on the forced movement of the Cherokee and Choctaw Tribes, taken together with the axiom of resolving well-founded doubts in favor of the Indian tribes. The net result overcame the presumption that the United States retained ownership of the river bed.
With this factual and legal background, it is necessary to examine the case at hand. However, before indulging in such analysis, it is helpful to reiterate some of the presumptions upon which Indian cases are based. Treaties with the Indians must be interpreted as the Indians would have understood them, and Indian treaties are to be construed in favor of the Indians. Choctaw Nation v. Oklahoma, supra. Concomitantly, doubtful expressions are to be resolved in favor of the Indian parties to the treaty. McClanahan v. State Tax Commission of Arizona, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Carpenter v. Shaw, 280 U.S. 363, 50 S.Ct. 121, 74 L.Ed. 478 (1930). Treaty and statutory provisions which are not clear on their face may "be clear from the surrounding circumstances and legislative history." Cf. DeCoteau v. District Court, 420 U.S. 425, 444, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300 (1975). Finally, there is the presumption that the United States does not intend to divest itself of the sovereign rights in navigable waters, and in the soil under them, absent the clearest expression of intent to the contrary. Shively v. Bowlby, supra at 58; United States v. Holt State Bank, supra.
Neither the Treaty of Fort Laramie of 1851 nor the Treaty of the Crow Indians of 1868 made specific reference to the title of the Big Horn River bed, a navigable stream. This case is similar in some respects to the Choctaw Nation case in the series of treaties involved. However, unlike the Crow Indians, the Choctaw Indians were forced to leave their aboriginal lands and the United States promised to convey different land to the Choctaw Nation in fee simple. Such a conveyance did not occur with respect to the Crow Indian Reservation. The aboriginal ownership of the Crow to the lands reserved for them is more akin to the facts presented in Holt State Bank, supra, even though such aboriginal title did not stem from time immemorial. The grant to the Choctaw and Cherokee indicated that no territory or state shall ever have the right to pass laws for the government of the Choctaw Nation and that no part of the land granted to them would ever be embraced in any territory or state. See, Choctaw Nation, supra, 397 U.S. at 625, 90 S.Ct. 1328. The treaties with the Crow Tribe do not reflect such a provision, explicitly exempting the Crow lands from ever being embraced in any territory or state. The treaties, the evidence, and the arguments presented in this case involving the Crow Indian Reservation, in particular the title to the bed and banks of the Big Horn River, most closely approximate those in the Holt State Bank case, supra, and not those in the Choctaw Nation case. Such analysis compels the conclusion that the bed and banks of the Big Horn River passed to the State of Montana upon its admission to the Union. United States v. Finch, 395 F.Supp. 205, 210 (D.Mont.1975).

B. Hunting and Fishing.

The Treaty of Fort Laramie of 1851 provides in Article 5 that the Indian tribes mentioned in the treaty did not surrender their privileges of hunting and fishing by accepting the respective reservations, but rather that they maintained such rights as well as the right to pass over any of the tracts of land described in the treaty for the purpose of hunting and fishing. *608 The Treaty with the Crow Indians, dated May 7, 1868, does not contain any reference to fishing. The retention by the tribes of the privilege of fishing does not carry with it as a matter of law, nor does it grant, the exclusive right to fish. Had the exclusive right to fish been deemed salient to the Crow, and it was not, based upon the record which is before the Court, surely it would have been mentioned in the treaties. This is especially so when it is considered that the Absorka or Crow language distinguished between privileges and rights. A treaty of similar vintage in this state provided for the exclusive right of taking fish. See, the Hellgate Treaty, 12 Stat. 975, with the Flathead, Kootenai, and other Pend Oreille Indians, Article 3. With this in mind, and considering the conclusions of the United States Supreme Court in Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), it is apparent that the State of Montana has exclusive jurisdiction to regulate nonmember hunting and fishing within the exterior boundaries of the Crow Indian Reservation.
The issue has previously been considered by the Court of Appeals for the Ninth Circuit in the case of United States v. Sanford, 547 F.2d 1085 (9th Cir. 1976).[10]
The Sanford case was a criminal case involving hunting by non-Indians on the Crow Indian Reservation, in violation of the laws of the United States and the laws of the State of Montana. The Sanfords were big game hunters and outfitters in Montana. After some preliminary arrangements with out-of-state hunters, who, unbeknownst to the Sanfords, were acting as agents of the Bureau of Sport Fisheries and Wildlife, a hunt into the Crow Indian Reservation was arranged. The party made their kill, took the cape of the elk, and went from the reservation to Wyoming. A second hunt was planned, and again the Sanfords and their hunters penetrated the exterior boundaries of the Crow Indian Reservation. A second elk was shot and killed; the animal was caped and the party left the reservation. The party next sojourned to hunt for Rocky Mountain Big Horn Sheep within Yellowstone National Park, but that hunt is not relevant to the issue considered here.
A seven-count indictment was returned against the Sanfords. Count II of the indictment charged two of the Sanfords with illegal entry on the Crow Indian Reservation, in violation of 18 U.S.C. § 1165. A third Sanford was similarly charged with the same offense but on a different day. The Ninth Circuit's instruction with respect to these counts is relevant to the case at hand. In Sanford, the government had argued that 18 U.S.C. § 1165 makes illegal the unauthorized killing of wildlife on Indian reservations. The Circuit found the contention to be ill taken, relying on the reasoning of the Montana Supreme Court in State v. Danielson, 149 Mont. 438, 427 P.2d 689 (1967), in reaching conclusion. Quoting the state decision:

It is significant to note that § 1165 does not directly prohibit hunting and fishing but makes the act of going upon the Indian reservation a violation if done for the purpose of hunting or fishing. . . [S]ection 1165 must be considered to be a statute providing a penalty for trespass to an Indian reservation and not an attempt by Congress to enter the field of fish and game regulation.

State v. Danielson, supra at 691.
In Sanford, the government also argued that the elk which were killed on the Indian reservation were killed in violation of the Montana Fish and Game Law, R.C.M. § 26-307(3). The argument required consideration of the preliminary issue of whether or not Montana game laws applied to the activities of non-Indians on Indian reservations. The Circuit Court held that they do. This conclusion was predicated *609 upon the Montana Supreme Court's statement in Danielson, supra, wherein it noted that:
[T]he State of Montana has jurisdiction to enforce its fish and game regulations on Indian reservations contained within its boundaries with respect to persons who are not tribal Indians unless precluded from doing so by an act of Congress or unless such enforcement would interfere with self-government on the reservation. State v. Danielson, 427 P.2d at 692-693.
A paramount consideration in the Sanford case is that 18 U.S.C. § 1165 does not represent an attempt by the federal government to enter the arena of fish and game regulation on the Crow Indian Reservation or on any other Indian reservation. After making this observation, the Circuit noted:
Further, we are convinced that the application of Montana game laws to the activities of non-Indians on Indian reservations does not interfere with tribal self-government on reservations. We express no opinion concerning the possible concurrent application of tribal law to non-Indians on Indian reservations under the circumstances of this case.

United States v. Sanford, 547 F.2d at 1089.
The regulation of hunting and fishing by non-Indians within the exterior boundaries of the Crow Indian Reservation does not conflict with an act or treaty of the Congress. Nor does it interfere with tribal self-government on the Crow Reservation. Montana long ago enacted a comprehensive fish and game code. See, § 26-101.1 et seq., R.C.M.1947. The State of Montana does not generally enforce its hunting and fishing laws against members of the Crow Tribe.[11] The Crow Reservation is regularly patrolled by game wardens employed by the Department of Fish and Game. Non-Indians are subjected to enforcement of the State's laws while they are within the exterior boundaries of the Reservation. Ultimately, the State is enfranchised to exercise its regulatory power over non-Indians on the Crow Reservation as an extension of its police powers over all land within its borders, regardless of title. Cf. The White Mountain Apache Tribe v. State of Arizona, et al. (No. Civ. 77-867 PHX, WPC, June 13, 1978). The State's statutory and regulatory scheme does not limit what the Tribe may prohibit with respect to hunting and fishing on tribal lands; it merely provides the conduit for enforcing the State's police power within its territory where non-Indians are involved.
The question upon which the Ninth Circuit expressed no opinion has apparently been resolved in the recent case of the United States Supreme Court, Oliphant v. Suquamish Indian Tribe, supra. The Court granted certiorari in Oliphant, 431 U.S. 964, 97 S.Ct. 2919, 53 L.Ed.2d 1059, to decide whether or not Indian tribal courts had criminal jurisdiction over non-Indians. It found they do not. Implicit in the Supreme Court's decision in Oliphant is the recognition that Indian tribes do not have the power, nor do they have the authority, to regulate non-Indians unless so granted by an act of Congress. The Court noted that from the earliest treaties with many tribes, it has been presumed that the tribes did not have criminal jurisdiction over non-Indians absent a Congressional statute or treaty provision to that effect. Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209. In discussing the various attempts to deal with the problem by the United States Congress, the Court noted that
Congress' concern over criminal jurisdiction in this proposed Indian Territory contrasts markedly with its total failure to address criminal jurisdiction over non-Indians on other reservations, which frequently bordered non-Indian settlements. The contrast suggests that Congress shared the view of the Executive Branch and lower federal courts that Indian tribal courts were without jurisdiction to try non-Indians. *610 Oliphant v. Suquamish, supra at 203, 98 S.Ct. at 1018.
While the Supreme Court did not find conclusive the commonly-shared presumption of the Congress, the Executive Branch, and the lower federal courts that tribal courts do not have power to try a non-Indian, it found the presumption to carry considerable weight. Oliphant v. Suquamish Indian Tribe, supra at 206, 98 S.Ct. 1011. Ultimately, the Court concluded:
. . . Indians do not have criminal jurisdiction over non-Indians absent affirmative delegation of such power by Congress.

Oliphant v. Suquamish Indian Tribe, supra at 208, 98 S.Ct. at 1020.
Indian tribes cannot exercise both "those powers of autonomous states that are expressly terminated by Congress and those powers `inconsistent with their status.'" Oliphant v. Suquamish.
By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress. [Quoting the 9th Circuit at 544 F.2d 1007, 1009.]

Oliphant v. Suquamish, supra at 210, 98 S.Ct. at 1021.
In the case at hand, the Crow Tribe has not been given an express delegation of the power to try non-Indians on the Crow Reservation. Nor was that power specifically retained in the tribe by the course of the Treaties of 1851 and 1868 and subsequent acts dealing with the Crow Tribe. The tribe cannot preempt a power which rests with the state government simply by enacting an ordinance inconsistent with the power and authority of the state, and consistent with tribal self-government, absent the authority of Congress. See, Fisher v. District Court, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). The Congress, in the dealings between states and Indian tribes, is the source of power to preempt state activity within the exterior boundaries of the Indian reservations.
The United States and the Crow Tribe have attempted to show in the trial of this case that the Tribe has continually exercised jurisdiction over hunting and fishing activities on the reservation. However, the preponderance of evidence supports a contrary conclusion. In matters of law enforcement involving non-Indians within the exterior boundaries of the Crow Indian Reservation, the Big Horn County Attorney has exercised near exclusive jurisdiction in prosecuting for offenses committed on fee land within the confines of the reservation. The Montana Department of Fish and Game wardens have patrolled the reservation and have cited on numerous occasions non-Indians for fish and game violations, whether the violations transpired on tribal, trust, or fee lands. Until approximately 1973, there was no real confrontation on the Crow Reservation regarding jurisdiction over non-Indians. The Tribe has from time to time been dissatisfied with the enforcement procedures involving nonmember hunting and fishing within the reservation; however, all parties understood that nonmember hunting and fishing regulation was a power belonging to the state. Where nonmembers violated fish and game laws, the jurisdictional boundaries for dealing with such cases were reduced to the following scheme: Montana exercised exclusive jurisdiction over nonmember hunting and fishing on fee patent land within the confines of the reservation. The federal government exercised concurrent jurisdiction, with the state, over nonmember fishing and hunting when such fishing and hunting was done without permission on tribal or trust property. The Crow Tribe neither had nor did it exercise jurisdiction over nonmember fishing and hunting activities within the reservation. The exception to the Tribe's attempt to exercise jurisdiction over non-Indian hunting and fishing is revealed in Tribal Resolution No. 74-05, passed by the Tribal Council in 1973, and Tribal Ordinance No. 1, enacted April 12, 1975. These acts of the Tribe proscribed all *611 nonmembers from fishing or hunting within the boundaries of the Crow Reservation. However, subsequent case law teaches that this attempted exercise of jurisdiction over non-Indians was fatally doomed.

VII. CONCLUSION
The common understanding of the various governmental entities involved was implicitly correct in the allocation of jurisdictional responsibility, considered in light of the Sanford decision, supra, and the United States Supreme Court's decision in Oliphant. The State of Montana has exclusive jurisdiction to regulate nonmember hunting and fishing within the exterior boundaries of the Crow Indian Reservation on fee lands. The State of Montana and the United States Government have concurrent jurisdiction to regulate nonmember hunting and fishing within the Crow Indian Reservation on tribal land or trust properties when the same transpire without the permission of the respective landowners. Finally, the Crow Tribe does not have jurisdiction over non-Indians' hunting and fishing activities within the Crow Reservation. As the Supreme Court in Oliphant noted:
Indian tribes do not have inherent jurisdiction to try and punish non-Indians.
The Tribe's authority with respect to non-Indian hunters and fishermen is limited, absent an act of Congress, to authorizing nonmembers to trespass on tribal and allotted lands within the reservation for purposes of hunting and fishing. To paraphrase Judge Smith of this Court, the Crow Tribe has as much authority to regulate non-Indian activities within the exterior boundaries of the Crow Reservation as the Congress says it has.
The record does not reflect any treaty or act of Congress which gives the Crow Tribe the power it seeks to exercise.
From the foregoing, I make the following Declaration and Judgment:
1. That the title to the bed and banks of the Big Horn River to the high water mark is quieted in the State of Montana, and was so granted upon the State's admission to the Union.
2. That the State of Montana has exclusive jurisdiction to regulate non-Indian hunting and fishing activities on the Big Horn River and all patented land owned by non-Indians within the exterior boundaries of the Crow Indian Reservation.
3. That the State of Montana has concurrent jurisdiction with the United States to regulate non-Indian hunting and fishing activities on tribal or Indian lands if such activities are in violation of state law. The concurrent jurisdiction of the United States to so regulate non-Indian activities is predicated upon 18 U.S.C. § 1165.
4. The Crow Indian Tribe's exclusive rights of hunting and fishing within the exterior boundaries of the Crow Indian Reservation are limited to those lands set forth in 18 U.S.C. § 1165.
5. The Crow Indian Tribe has no authority to regulate non-Indian hunting and fishing activities within the exterior boundaries of the Crow Indian Reservation, save in granting permission to non-Indians to trespass on tribal or Indians lands for the purpose of hunting and fishing.
Pursuant to Rule 52(a), Federal Rules of Civil Procedure, this Opinion shall constitute the Court's Findings of Fact and Conclusions of Law. The Clerk is directed to enter, by separate document, a judgment consistent with the declarations set forth herein.
NOTES
[1] United States v. Finch, D.C., 395 F.Supp. 205 (1975), wherein this Court declared that the Big Horn River belonged to the State of Montana, was subsequently reversed by the Ninth Circuit Court of Appeals. United States v. Finch, 548 F.2d 822 (9th Cir. 1972). However, the Ninth Circuit decision was thereafter vacated by the United States Supreme Court when that Court granted certiorari, reversed the Circuit Court decision on other grounds, and directed the Circuit to dismiss the appeal. 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048. This Court does not feel bound by the Circuit's determinations in the Finch case, supra. The Circuit's decision in United States v. Finch, supra, may be an indication of how that Court would rule if there were an appeal in this case. However, I am confident that the Court of Appeals will find, on the record made here, that the bases for its earlier decision are not supported by the record.
[2] United States v. Sanford, 547 F.2d 1085 (9th Cir. 1976), is particularly appropriate to this issue, as the case involved the same Indian reservation. The Circuit adopted the reasoning of the Montana Supreme Court with respect to the regulation of hunting and fishing by non-Indians on the Crow Indian Reservation, and adopted the state court's reasoning in interpreting 18 U.S.C. § 1165. See, State v. Danielson, 149 Mont. 438, 427 P.2d 689 (1967). Accord, The White Mountain Apache Tribe v. The State of Arizona, Dept. of Fish and Game, et al. (No. Civ. 77-867, PHX WPC, June 13, 1978).
[3] See, the maps reproduced in United States v. Finch, 395 F.Supp. 205, at 215-220 (D.Mont. 1975).
[4] Treaty of Fort Laramie, 11 Stat. 749; Crow Nation v. United States, 81 Ct.Cl. 238, 248 (1935).
[5] See, 22 Stat. 42 (1882); 26 Stat. 989 (1891); 33 Stat. 352 (1904); 50 Stat. 884 (1937). See also, Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); De-Coteau v. District County Court, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1973); Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962).
[6] Joe Medicine Crow, the Tribal Historian, testified that the Crow have followed agrarian pursuits intermittently for the last four centuries. See also, Articles 3, 6, 8, 9 and 10 of the treaty.
[7] The allotment philosophy was terminated in large part by the Indian Reorganization Act of 1934.
[8] United States v. Brewer-Elliott Oil & Gas Co. (D.C.Okl.), 249 F. 609, aff'd 8 Cir., 270 F. 100, aff'd 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140 (1922); 20 Cong.Rec., House, 815; see also, S.R. 75, January 23, 1888, H.R. 1025, March 13, 1888.
[9] For a discussion of the relevant background of the Crow Tribal Government, see, Stands Over Bull v. Bureau of Indian Affairs, 442 F.Supp. 360 (D.Mont.1977), aff'd (9th Cir., May 22, 1978), vacated in part 578 F.2d 799 (9th Cir. 1978).
[10] In Quechan Tribe of Indians v. Rowe, 531 F.2d 408 (9th Cir. 1976), decided prior to Oliphant v. Suquamish, and United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), which involved a different Indian reservation than the Crow Reservation, a contrary conclusion was reached to that reached in United States v. Sanford, supra. See also, The White Mountain Apache Tribe v. State of Arizona, et al., supra n. 2.
[11] There was testimony presented at trial that enrolled members had, on occasion, been charged and tried for fish and game violations on fee land within the reservation.