The UNITED STATES of America and the Crow Tribe of Indians, Montana, Appellants,*

v.

The STATE OF MONTANA, Montana State Fish and Game Commission, Willis B. Jones, Arnold Rieder, Arthur C. Hagenston, Joseph H. Klabunde, W. Leslie Pengelly, and Wesley R. Woodgerd, Appellees.

Nos. 78–2917, 78–2865.

United States Court of Appeals, Ninth Circuit.

June 12, 1979.

As Modified on Denial of Rehearing Sept. 20, 1979.

* The Shoshone Indian Tribe and the Assiniboine and Sioux Tribes filed a brief as *amicus curiae* urging reversal.

Steven E. Carroll, Atty., U. S. Dept. of Justice (argued), Washington, D. C., for the U. S.

Urban L. Roth, Sp. Asst. Atty. Gen. (argued), Butte, Mont., for State of Mont.

Thomas K. Schoppert (argued), Lynaugh, Fitzgerald, Schoppert, Skaggs & Essman, Billings, Mont., for Crow Tribe of Indians.

Before SNEED and ANDERSON, Circuit Judges, and D. WILLIAMS,** District Judge.

SNEED, Circuit Judge:

This is an appeal by the United States and the Crow Indian Tribe (appellants)

** Hon. David W. Williams, United States District Judge for the Central District of California, sitting by designation.

from a final declaratory judgment entered by the district court (D. Mont.) in an action brought against the State of Montana seeking to determine title to the bed of the Big Horn River within the exterior boundaries of the Crow Indian Reservation and to resolve certain questions regarding the authority to regulate the hunting and fishing activities of non-Indians and others not members of the Crow Tribe within the exterior boundaries of the reservation. We note jurisdiction under 28 U.S.C. § 1291, and reverse.

### FACTS.

The Crow Indian Reservation is the remnant of a much larger tract of land recognized as Crow lands by the United States in the Treaty of Fort Laramie of 1851, 11 Stat. 749. In 1868, this original reservation was diminished from one of 38,531,174 acres to one of approximately 8,000,000 acres by the Second Treaty of Fort Laramie, 15 Stat. 649. Subsequent Congressional Acts have reduced the size of the reservation even further to its present acreage of approximately 2,282,764 acres.[1] The Big Horn River is a navigable watercourse that flows through the heart of the reservation from south to north.

The Treaties of 1851 and 1868 contain only two explicit references to hunting and fishing rights. Article 5 of the Treaty of 1851 states that the eight Indian nations signatory to the treaty "do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described." Article 4 of the Treaty of 1868 provides that the Indians "shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and as long as peace subsists among the whites and Indians on the borders of the hunting districts." Notwithstanding these scant references to the Crow Tribe's hunting and fishing rights, Article 2 of the Treaty of 1868 specifically describes the reservation as that place "set apart for the absolute and undisturbed use and occupation of the Indians."

Originally, all land within the reservation was held by the United States in trust for the Crow Tribe. No land could be transferred to non-Indians. The Allotment Acts of 1887 and 1920,[2] however, provided that patents in fee could be issued by the United States to individual Indian allottees. Once these patents were issued, the allottees could convey their land to non-Indians. At present, approximately 30% of the land within the reservation is owned in fee. The great majority of the remainder is owned by the United States in trust either for individual Indians or for the Crow Tribe.[3]

In 1973, the Crow Tribal Council passed Resolution 74–05 which prohibits hunting and fishing within the reservation by everyone other than members of the Crow Tribe.[4]

---

1. *See* 22 Stat. 42 (1882); 26 Stat. 989 (1891); 33 Stat. 352 (1904); 50 Stat. 884 (1937). *See also* the maps reproduced in *United States v. Finch*, 395 F.Supp. 205, 215–20 (D.Mont.1975).

2. 24 Stat. 388; 41 Stat. 751.

3. Of the 2,282,764 acres of reservation land that remain, the ownership can be broken down as follows:

| Type of Ownership | Acreage | Percentage of Ownership to Total Acreage |
|---|---|---|
| Allotted | 1,187,592.34 | 52.02% |
| Tribal (Surveyed) | 379,740.64 | 16.64% |
| Tribal (Unsurveyed) | 15,850.85 | .69% |
| Government Owned | 1,400.50 | .07% |
| Yellowtail Dam | 6,695.64 | 29% |
| State Lands | 44,804.82 | 1.96% |
| Fee Lands | 646,679.12 | 28.33% |
| TOTAL: | 2,282,764.00 | 100.00% |

*United States v. Montana*, 457 F.Supp. 599, 602 (D.Mont.1978).

4. Resolution 74–5 states in part:

Be it ordained by the Crow Tribe, meeting in a duly held and noticed council that hunting, fishing and trespassing within the exterior boundaries of the Crow Indian Reservation is hereby prohibited and the proper officials of the United States and the Crow Tribe of Indians are hereby directed and authorized to enforce the provisions of this ordinance and any federal statute which would prohibit such hunting and fishing and trespassing, provided, however, that the provisions of this ordinance shall not apply to the members of the Crow Tribe of Indians.

The State of Montana, however, as it has done in the past, continues to authorize hunting and fishing within the reservation by announcing the opening and closing of hunting seasons to all lands within the reservation and by issuing hunting and fishing licenses which purport to allow those not members of the Crow Tribe to hunt and fish within the reservation. This conflict between the State of Montana and the Crow Tribe concerning hunting and fishing within the reservation has resulted in this present action.[5]

In the court below, appellants sought a judgment declaring that: (1) The United States holds title to the bed and banks of the Big Horn River within the exterior boundaries of the Crow Indian Reservation in trust for the Crow Tribe; (2) The Crow Tribe has authority to prohibit hunting and fishing within the reservation by those not members of the Crow Tribe; and (3) The State of Montana has no authority to regulate hunting and fishing within the exterior boundaries of the reservation. The district court held that: (1) The title to the bed and banks of the Big Horn River to the high water mark is held by the State of Montana; (2) The State of Montana has exclusive jurisdiction to regulate non-Indian hunting and fishing activities on the Big Horn River and all patented land owned by non-Indians within the exterior boundaries of the Crow Indian Reservation; (3) The State of Montana has concurrent jurisdiction with the United States to regulate non-Indian hunting and fishing activities on tribal or Indian lands if such activities are in violation of state law; (4) The Crow Tribe's exclusive rights of hunting and fishing within the reservation are limited to those lands set forth in 18 U.S.C. § 1165; and (5) The Crow Tribe has no authority to regulate non-Indian hunting and fishing activities within the exterior boundaries of the reservation, save in granting permission

to non-Indians to trespass on tribal or Indian lands for the purpose of hunting and fishing. *United States v. Montana,* 457 F.Supp. 599, 611 (D.Mont.1978).

We reverse and remand to the district court with instructions to enter a judgment consistent with the holdings of this opinion. Our holdings are as follows:

■ (1) That the title to the bed and banks of the Big Horn River to the ordinary high water mark situated within the exterior boundaries of the Crow Indian Reservation is held in trust by the United States for the use and benefit of the Crow Tribe of Indians.

■ (2) That Resolution 74–05 adopted by the Crow Tribe, meeting in a duly held and noticed council, is a valid exercise of tribal power except insofar as it attempts to proscribe all hunting and fishing by those not members of the Crow Tribe (whether Indians or non-Indians) on fee patent lands on which such non-members reside.

■ (3) That the Crow Tribe has the power to regulate hunting and fishing within the exterior boundaries of the Crow Indian Reservation by non-members of the Crow Tribe (whether Indian or non-Indian) subject to the following limitations:

(a) That the Crow Tribe lacks the power to impose criminal sanctions on non-Indians who violate its hunting and fishing regulations,

(b) That the exercise by the Crow Tribe of its power to regulate hunting and fishing by non-Indians must be within the constraints recognized by this court in *Quechan Tribe of Indians v. Rowe,* 531 F.2d 408 (9th Cir. 1976),

(c) That the regulation of hunting and fishing by non-members of the Crow Tribe (whether Indians or non-Indians) who reside on fee patent lands within the reservation, whether such hunting and

Be it further resolved, that the Crow Tribal officials inform the State Fish and Game Department for the State of Montana and Bureau of Indian Affairs (United States Department of Interior) that hunting and fishing on the Crow Reservation is hereby closed.

5. Because the Crow Tribe itself was a party bringing this action, this case therefore is clearly distinguishable from *California v. Quechan Tribe of Indians,* 595 F.2d 1153 (9th Cir. 1979). In that case we held barred by sovereign immunity a suit brought by California *against* a tribe.

fishing is done on such lands or elsewhere within the reservation, must be reasonable and consistent with sound principles of conservation.

■ (4) That the State of Montana also has the power to regulate hunting and fishing within the exterior boundaries of the Crow Reservation by non-members of the Crow Tribe (whether Indian or non-Indian) subject to the following limitations:

(a) That such regulations of the State of Montana not regulate indirectly the hunting and fishing by members of the Crow Tribe.

(b) That such regulations of the State of Montana must have as their purpose the conservation and proper management of game and fish and not to discriminate against, nor to impede authorized regulation, by the Crow Tribe.

The authorities and reasons supporting these holdings are set forth in the balance of this opinion.

## I.

### BED AND BANKS OF BIG HORN.

We have previously considered the status of the title to the bed and banks of the Big Horn River within the exterior boundaries of the Crow Reservation. *United States v. Finch*, 548 F.2d 822 (9th Cir. 1976), *vacated*, 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977).[6] We held that to the ordinary high water mark the title to the bed and banks of the Big Horn is held by the United States in trust for the Crow Tribe. Although our judgment was vacated by the Supreme Court on grounds not related to the issue of title, we regard our holding in

*Finch* as the applicable authority in this circuit. While recognizing that the issue is a close one, we again hold, as did *Finch*, that within the exterior boundaries of the reservation, the United States, not the State of Montana, holds the title and that that title is held in trust for the Crow Tribe.

## II.

### VALIDITY OF TRIBAL REGULATION 74–05.

The power of the Crow Tribe to exclude those not members of the tribe from hunting and fishing within the exterior boundaries of the reservation has its source in the treaties of 1851 and 1868. As already indicated, Article 5 of the Treaty of 1851 recognized that none of the Indians whose tribes were parties to the treaty surrendered "the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described." It was recognized in *Crow Tribe of Indians v. United States*, 284 F.2d 361, 151 Ct.Cl. 281 (1960), *cert. denied*, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1960) that this provision permitted entry by members of each of the signatory tribes on the territory as described in the treaty of each other signatory tribe for the purpose of hunting and fishing. At the same time, the Treaty of 1851 recognized the title of the Crow Tribe to the lands described therein as belonging to it. *Crow Tribe of Indians v. United States, supra.*

This recognition was confirmed by the circumstances surrounding the execution, as well as the language, of the Treaty of 1868. In *United States v. Finch*, supra, 548 F.2d at 830–31, we pointed out that the purpose

---

**6.** *United States v. Finch*, 548 F.2d 822 (9th Cir. 1977), involved a criminal prosecution under 18 U.S.C. § 1165, which makes punishable the unauthorized entry upon Indian lands for the purpose of hunting, fishing or trapping. While standing on the bank of the Big Horn River within the Crow Indian Reservation, the defendant had cast a fishing lure into its waters. He was subsequently charged with violating section 1165. The district court dismissed the information on the ground that Montana owned the bed of the Big Horn River and that, therefore, there had been no unauthorized entry

upon Indian lands. We reversed, holding that the United States, by signing the Treaty of 1868, granted the Crow Tribe dominion and control over that portion of the bed of the Big Horn River situated within the reservation and that the defendant had therefore made an entry upon Indian land. *United States v. Finch, supra*, 548 F.2d at 831. Although the Supreme Court vacated our decision on double jeopardy grounds, 433 U.S. 676, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977), our analysis of the title issue was in no way questioned.

of the 1868 treaty was to reduce the size of territory designated by the Treaty of 1851 as belonging to the Crow. We also pointed out that the 1868 treaty contained an explicit agreement by the United States that the reduced territory would be "set apart for the absolute and undisturbed use and occupation of the Indians herein named and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them . . . ." Furthermore, the 1868 treaty stated:

> [T]he United States now solemnly agrees that no person, except those herein designated and authorized so to do, and except such officers, agents, and employes of the Government as may be authorized to enter upon Indian Reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians . . .

Art. 2, 15 Stat. 649.

By acquiring from the Crows a very substantial part of the territory set apart for them by the 1851 treaty the United States "intended that all lands therein [the reduced territory], including the riverbed, were to be for the exclusive use of the tribe." *United States v. Finch, supra*, 548 F.2d at 831. However, the 1868 treaty in Article 4 accorded the Indians a qualified right to hunt on the land acquired from the Crows by the United States. The Article provides that the Indians "shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and as long as peace subsists among the whites and Indians on the borders of the hunting districts."

It must be admitted that the two treaties do not establish irrefutably the validity of Tribal Regulation 74–05. At the time of the treaties the Crows were primarily hunters of buffalo and elk and their hunting

parties did not always remain within their treaty-designated territory, a fact the Treaty of 1868 explicitly recognized. Nor was their treaty-designated territory an area within which only they, but not others, hunted. Immigrants destined for Oregon and California as well as other Indians undoubtedly hunted and fished within this territory.

Big game stocks, however, were being depleted, a fact that caused anxiety among the Crows and official concern on the part of the United States. In *Finch*, we construed the Treaty of 1868 to reflect this official concern and to "set aside lands which would provide the tribe with the food and natural resources upon which their livelihood depended." We declined to interpret the Treaty to deprive the Crows of "potential control over [any] source of food on their reservation." 548 F.2d at 832. This Treaty, augmented by 18 U.S.C. § 1165, which makes going on Indian land to hunt or fish without permission a criminal offense, led us in *Finch* to hold that "the right of Indians to control hunting, trapping and fishing on their lands is a prerogative of ownership which the United States recognizes as a matter of federal law." 548 F.2d at 834. We do not retreat from that holding.[7]

We must, however, here confront an issue that was absent in *Finch*. It is the extent to which the Crows can prohibit hunting and fishing within the reservation by those who, while not members of the tribe, reside on fee patent lands within the reservation. Tribal Regulation 74–05 entirely proscribes hunting and fishing by *all*, except those who are members of the Crow Tribe. By attempting to preclude *all* hunting and fishing by non-members of the Crow Tribe who reside on fee patent land within the reservation we believe the Crow Tribe exceeded its powers under the treaties as augmented by 18 U.S.C. § 1165.

---

**7.** Of course, to the extent that Crow Tribal Resolution 75–17b purports to allow the Crow Tribe to exercise criminal jurisdiction over non-Indians in order to enforce 74–05, it is invalid

under the holding in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).

We take this position in full awareness that impairment or modification of a treaty right is not lightly to be imputed to Congress. *See, Menominee Tribe of Indians v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). Nonetheless, it is a fact that subsequent to the 1851 and 1868 treaties Congress enacted the General Allotment Act of 1887 [8] and the Crow Allotment Act of 1920,[9] one of the recognized consequences of which was the occupation in time of fee patent lands by non-Indians and perhaps other Indians not members of the Crow Tribe. Substantial assimilation was a goal of these Acts.[10] While neither of these Acts, nor any other to which our attention has been called,[11] explicitly qualifies the Tribe's rights over hunting and fishing, it defies reason to suppose that Congress intended that non-members who reside on fee patent lands could hunt and fish thereon only by consent of the Tribe. So far as the record of this case reveals, no efforts to exclude completely non-members of the Crow Tribe from hunting and fishing within the reservation were being made by the Crow Tribe at the time of enactment of the Allotment Acts.[11A] Game had grown scarce and the agrarian life in a substantially assimilated society appeared to offer the Crows the means of survival.[12] Undoubtedly the desire for land by non-Indians constituted an additional force behind the passage of the Allotment Acts. The pres-

---

8. 24 Stat. 388, 25 U.S.C. § 331 et seq.

9. 41 Stat. 751.

10. 59 Cong.Rec. 6000 (1920) (remarks of Rep. Riddick quoting Frank Yarlott, tribal representative):

    As the bill now stands, it has the unqualified endorsement of the entire tribe. To the educated Indians who have closely watched events this seems the best solution to the long vexed "Indian problem." This means the gradual influx of white settlers, with whom the Indians will become acquainted and gradually absorb their methods of farming and cattle raising. They will come to understand the white temperament gradually and be friends.

11. *See* Act of April 11, 1882, 22 Stat. 42; Act of July 10, 1882, 22 Stat. 157; General Allotment Act, Act of February 8, 1887, 24 Stat. 388, 25 U.S.C. § 331 et seq.; Act of March 3, 1887, 24 Stat. 545; Act of February 12, 1889, 25 Stat. 660; Act of March 1, 1893, 27 Stat. 529; Act of April 27, 1904, 33 Stat. 352; Act of June 4, 1920, 41 Stat. 751; Act of May 26, 1926, 44 Stat. 658; Acts of April 15 and July 3, 1930, 46 Stat. 168 and 860, 876; Act of July 15, 1958, 72 Stat. 361. Section 2(d) of this last Act specifically confirms the right of members of the Crow Tribe to fish without state regulation on those parts of the reservation taken for Yellowtail Dam and Reservoir.

11A. Exhibits covering the years 1912 to 1923, a time bracketing the period of the 1920 Allotment Act, demonstrate a concern with non-Indian hunters on the Crow Reservation. (Pl. Exs. 5–27.) At that time a federal statute prohibited non-Indian hunting in Indian country except for subsistence purposes. (Pl. Ex. 22.) The concern focuses predominantly upon "hunting parties on the reservation which had become so frequent as to reduce the wild game materially, and in some cases interfered with the grazing of live stock on the reservation." (Pl. Ex. 10.) These exhibits demonstrate concern not only for over-hunting by non-Indians, but also bad hunting practices by Indians themselves, indicating that even they should be subject to state hunting regulations. (Pl. Ex. 23.)

    The end product of this concern is a set of regulations enacted by the Crow Tribe forbidding fishing or hunting on the reservation except upon a permit issued by the superintendent of the reservation. Hunting of larger game, the numbers of which had been badly depleted, was not to be permitted at all. (Pl. Ex. 25.) The fees called for and references to the revenue derived therefrom indicate that the regulation may have had a not insignificant money raising purpose. (Pl. Exs. 25 & 26.) Morever, the regulation clearly foresaw a close interrelationship between the reservation-issued permits and state regulation. Limits and seasons of the state regulation applied to all permittees.

    These exhibits also distinguish, albeit not in a precise manner, between non-resident non-Indians and resident non-Indians. Thus the allowance of "subsistence" hunting and fishing recognizes the rights of resident non-Indians to gather food and game necessary to life. Interior Department correspondence recognizes the difficulty in not permitting bona fide residents of the reservation to hunt. (Pl. Ex. 9.) Some correspondence notes that the existing practice was to prohibit hunting and fishing by "outsiders." (Pl. Exs. 15, 17 & 18.) The Department of the Interior also recognized the difficulty of preventing fishing along streams with considerable patent land, seemingly recognizing that the holders of that land might fish if they so chose. (Pl. Ex. 22.) It appears on this record that no serious effort to completely forbid hunting and fishing by all non-Indians on reservation lands was made.

12. See note 10, *supra.*

ence of this force in no way weakens, indeed, it only strengthens, our belief that Congress did not intend to make the fee patent land occupier's bagging of game from his front step subject to permission of the Crow Tribal Council.

We must recognize that in this case, as in others in which we are required to fix the rights and powers of Indians in the latter part of the twentieth century in the light of treaties of an earlier century, our task is to keep faith with the Indian while effectively acknowledging that Indians and non-Indians alike are members of one Nation. Both seek power and gain through identical processes, *viz.* commerce, politics, and litigation. We must, however, live together, a process not enhanced by unbending insistence on supposed legal rights which if found to exist may well yield tainted gains helpful to neither Indians nor non-Indians.

In this spirit we hold that, as to those not members of the Crow Tribe who reside on fee patent lands within the reservation, Tribal Regulation 74–05 is invalid insofar as it attempts to proscribe all hunting and fishing on the lands on which such non-members reside.[13] Two aspects of our holding require emphasis. The first is that the proscription is lifted only with respect to non-members who reside on fee patent lands within the reservation. Such resident non-members may be owners of fee patent lands or those whose occupancy is authorized by an owner as, for example, tenants or employees. Non-resident non-member owners remain subject to the exclusion. The second is that non-member residents enjoy freedom from the absolute proscription only with respect to hunting and fishing on tracts on which they reside. With respect to all other territory within the reservation they are subject to the regulation's bar. In this manner we believe the regulation is

accorded a scope that keeps faith with the Crows while avoiding a construction that could only foster confrontations of an unpredictable character.

The distinction between non-member residents and non-resident non-member owners rests on the proposition that modifications of Indian treaty rights should be narrowly construed. Our modification with respect to non-member residents recognizes that those who "live on the land" in the West are likely to regard hunting and fishing thereon to be as natural and ordinary as working, sleeping, and eating.[13A] Those who do not "live on the land" are somewhat less inclined. We, therefore, group all non-resident non-members together even though some in fact may own fee patent land within the reservation.

## III.

POWER OF CROW TRIBE AND THE STATE OF MONTANA TO REGULATE HUNTING AND FISHING BY THOSE NOT MEMBERS OF THE TRIBE WITHIN THE CROW RESERVATION.

The power to exclude those not members of the Crow Tribe from hunting and fishing within the exterior boundaries of the Crow Reservation that Tribal Regulation 74–05 asserts, the validity of which we have substantially upheld, does not perforce embrace the exclusive power to regulate hunting and fishing by non-members within the reservation. The private owner of land may exclude the public from hunting and fishing thereon; his admission of the public, however, does not clothe him with all the raiment of sovereignty.

The Crow Tribe with respect to its reservation is, of course, more than merely a

---

**13.** The extent to which the Crow Tribe may *regulate* hunting and fishing by resident non-members is discussed in Part III, *infra.*

**13A.** Evidence that federal officials recognized to some degree this residential right to pursue game is found in exhibits noting problems

with non-Indian hunters impinging on Indian lands but allowing "subsistence" hunting and possibly even recognizing the right of owners to fish on patent land within reservations. *See* note 11A, *supra.*

private owner. The Tribe possesses "attributes of sovereignty over both their members and their territory. . . ." *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). These "attributes" spring from "*inherent powers of limited sovereignty which [have] never been extinguished.*" 435 U.S. at 322, 98 S.Ct. at 1086 (quoting F. Cohen, Handbook of Federal Indian Law, 122 (1945) (emphasis in original). On the other hand, the sovereignty of the Crow Tribe is *limited.* "It exists only at the sufferance of Congress and is subject to complete defeasance." 435 U.S. at 323, 98 S.Ct. at 1086. It does not embrace, for example, criminal jurisdiction over non-Indians. *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). Moreover, the Court in *Oliphant* observed:

> "Indians are within the geographical limits of the United States. The soil and people within these limits are under the political control of the Government of the United States, or of the States of the Union. There exists in the broad domain of sovereignty but these two. There may be cities, counties, and other organized bodies with limited legislative functions, but they . . . exist in subordination to one or the other of these two." *United States v. Kagama,* 118 U.S. 375, 379, 6 S.Ct. 1109, 1111, 30 L.Ed. 228 (1886).

435 U.S. at 211, 98 S.Ct. at 1022.

This court on two occasions has spoken specifically about the power of Indian tribes to regulate hunting and fishing within their reservations. In *Quechan Tribe of Indians v. Rowe,* 531 F.2d 408 (9th Cir. 1976), after recognizing the power under the Quechan Tribe's Constitution to control hunting and fishing on its reservation, we delineated its powers in the following manner.

> Given those powers, the Quechan Tribe may exercise several types of authority over non-members who enter the reservation to hunt or fish. These are the rights to determine who may enter the reservation; to define the conditions upon which they may enter; to prescribe rules of conduct; to expel those who enter the reservation without proper authority or

those who violate tribal, state or federal laws; to refer those who violate state or federal laws to state or federal officials; and to designate officials responsible for effectuating the foregoing.

531 F.2d at 411.

Also, after denying that the Quechan Tribe had authority to assert criminal jurisdiction over non-members who violate tribal law while on the reservation, we further held the Tribe could not cause a forfeiture of a non-member's weapons or other property as a consequence of violating tribal law.

The second occasion was in *United States v. Sanford,* 547 F.2d 1085 (9th Cir. 1976), a case pertaining to hunting by non-members of the Crow Tribe on the Crow Reservation. We held that on the basis of the record before us Montana game laws were applicable to hunting and fishing by non-members on the Crow Reservation. We accepted as correct the following statement made by the Supreme Court of Montana in *State v. Danielson,* 149 Mont. 438, 427 P.2d 689, 692–93 (1967):

> [T]he State of Montana has jurisdiction to enforce its fish and game regulations on Indian reservations contained within its boundaries with respect to persons who are not tribal Indians unless precluded from doing so by an act of Congress or unless such enforcement would interfere with self-government on the reservation.

Our task is to adjust the powers of the Crow Tribe and the State of Montana in a manner consistent with these authorities. We lack the power to alter them even if we wished to do so. We approach this task convinced that the preservation and improvement of the stocks of fish and game within the State of Montana, as well as the Crow Reservation, requires the cooperation of the United States, the State of Montana, and the Crow Tribe. The nature of this cooperation cannot be fixed by reference to the contributions made in the past by each of the three to fish and game conservation. Rather it must rest on the above authorities and be shaped by the best judgment of which we and all parties to this lawsuit are capable.

So guided, our holdings, as previously indicated, are as follows. The Crow Tribe, to the extent it permits hunting and fishing within the exterior limits of its reservation by non-members, must regulate such hunting and fishing in the manner prescribed in *Quechan Tribe of Indians v. Rowe.* That is, the Tribe may fix the seasons and limits with respect to each species of game or fish applicable to non-member hunting and fishing as it sees fit. Enforcement of these regulations, however, must be accomplished without subjecting non-Indians to the criminal jurisdiction of the tribal courts.[14] Forfeiture of the arms or other property of non-Indians under *Quechan* constitutes an impermissible criminal sanction. All other actions by tribal officials sanctioned by *Quechan* are available to aid the Tribe in enforcing its regulations. Fees, for example, may be imposed on non-members by the Tribe for the privilege of hunting and fishing on the Crow Reservation.

The State of Montana, as *Sanford* teaches, also retains the power to regulate hunting and fishing by those not members of the Crow Tribe within the limits of the Crow Reservation. While the State of Montana cannot require the Crows to admit non-members into the reservation for the purpose of hunting and fishing, non-members who do obtain such permission remain subject to Montana's fish and game laws while so hunting and fishing and, of course, are subject to tribal regulations as well. Thus, a non-member so hunting or fishing must obtain a proper license from the State of Montana as well as from the Crow Tribe. Fish and game limits imposed by the State remain applicable to non-members. Violators are subject to such civil and criminal penalties as the State imposes.

Dual regulation of hunting and fishing on Indian reservations is not unknown. *See Confederated Tribes of the Colville Indian Reservation v. Washington,* 591 F.2d 89 (9th Cir. 1979). In *Confederated Tribes* we described the role of the State of Washington under the structure of dual regulation. We there recognized as follows:

> The only authority claimed by the State is to impose upon non-Indians who wish to fish upon the reservation its licensing requirements and such of its statutes and regulations as impose restrictions equal to or more restrictive than those that the Tribes apply to both Indians and non-Indians who fish on the reservation. The State does not claim that it can authorize fishing or fishing practices by non-Indians on the reservation that are prohibited by the Tribes' regulations.

591 F.2d at 92.

This substantially describes the State of Montana's effective role with respect to hunting and fishing by non-members on the Crow Reservation. As to such hunting and fishing the more severe restrictions, whether originating with the State or the Tribe, control.[15]

---

14. We express no opinion with respect to whether non-member Indians are subject to the criminal jurisdiction of the Crow tribal courts.

15. In *United States v. Sanford, supra,* 547 F.2d 1085, we held that Montana's game laws applied to the activities of non-Indians on Indian reservations. We predicated this holding on our conviction that "the application of Montana game laws to the activities of non-Indians on Indian reservations does not interfere with tribal self-government on reservations." 547 F.2d at 1089. In *Sanford,* however, we were not confronted with conflicting tribal and state regulations.

When both state and tribal fish and game regulations further the goal of maximizing the utility of fish and game resources, and when the state's regulations are more restrictive than the tribe's, a non-Indian who violates the state regulation on the reservation is subject to state law. Such exercise of jurisdiction by the state does not infringe upon the tribe's right to self-government.

The decision in *Eastern Band of Cherokee Indians v. North Carolina Wildlife Resources Commission,* 588 F.2d 75 (4th Cir. 1978), is distinguishable. There, the circuit court held that North Carolina could not enforce its fishing licensing laws with respect to non-Indians fishing for trout in streams on the Band's reservation because such enforcement would violate the standard established in *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), which stated that: "[A]bsent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and

We recognize that dual regulation of non-member hunting and fishing requires cooperation between the State's enforcement personnel and that of the Tribe. We believe that this will be forthcoming. Obviously the United States can and should contribute significantly in bringing about this cooperation. It is equally obvious that the State of Montana must promulgate and enforce its regulations in a manner that does not infringe "on the right of reservation Indians to make their own laws and be ruled by them." *See Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959). This means, *inter alia,* that Montana can neither regulate, directly nor indirectly, hunting and fishing by members of the Crow Tribe nor fashion its regulations of non-member hunting and fishing so as to discriminate against the Crow Tribe rather than to conserve the game and fish.

Our recognition of dual regulation of non-member hunting and fishing indicates that, as in *Confederated Tribes,* we find no "clear manifestation" of a congressional intent to preempt state regulation entirely. Nor would the adoption by the Crow Tribe of comprehensive regulations governing non-member hunting and fishing within the reservation "clearly manifest" such an intent. The Crow Tribe is neither the United States nor its Council the Congress thereof.

Regulation by the Crow Tribe of hunting and fishing by non-members who reside on fee patent lands located within the reservation requires special attention. As we held above, the Crow Tribe lacks the power to proscribe all hunting and fishing on fee patent lands by non-members who reside

thereon. We now hold, however, that Congress did not intend by the applicable allotment acts to deprive the Tribe of all power to regulate such hunting and fishing. Regulation of hunting and fishing by non-members who reside on fee patent lands within the reservation, whether done on such lands or elsewhere within the reservation, must be reasonable, nondiscriminatory, and consistent with sound principles of conservation. Within these limits such hunting and fishing may be regulated by the Crow Tribe.

## IV.

### A POSTSCRIPT.

Our holdings reflect a degree of precision not always present in the sources on which we must rely. We recognize this. Our justification is that the problems this case presents are serious and require resolutions whose outlines are reasonably sharp and clear. While the judiciary is frequently not the institution of government best suited to frame such resolutions, its ability to intervene upon being invoked by the plaintiff in a lawsuit enables it to provide provisional relief when it is perceived that legislative or executive solutions are unlikely to be offered within the reasonably foreseeable future. This is precisely the situation we believe we confront in this case as well as in many other cases involving those responsibilities and necessities which this Nation confronts in dealing with Indians. Should we err in this belief, the events that demonstrate our error will also remove its harmful consequences. We, therefore, in this spirit

---

be ruled by them." 358 U.S. at 220, 79 S.Ct. at 271. In the *North Carolina Wildlife Resources* case, the state imposed a license fee of $5.50, but the Band had a fee of only $2.00 and did not require non-members to have a state license in order to fish on the reservation. The court stated:

> The strong federal policy supporting the Band's fishing program and the significant federal efforts sustaining it demonstrate an intention to preclude state regulation of non-member fishing on the Band's reservation.
>
> . . .
>
> [The license requirement] also frustrates and impedes one major goal of tribal self-

government, financial self-sufficiency. . . . [It] would impair the Band's attempts to manage its own affairs by curbing its revenues and reducing the receipts of many of its members doing business with tourists.

588 F.2d at 78.

Central to the court's decision was its conclusion that North Carolina had "no possible interest . . . in this purely commercial undertaking." 588 F.2d at 79. In our case, however, Montana has a great interest in protecting the migratory game which pass over reservation lands.

reverse the judgment of the district court and remand this case to that court to enter a judgment that reflects our holdings.

REVERSED and REMANDED.

## OPINION ON PETITION FOR REHEARING

PER CURIAM:

Subsequent to the date our opinion was filed the Supreme Court rendered its decision in *Wilson v. Omaha Indian Tribe,* —— U.S. ——, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979). The State of Montana in its petition for rehearing argued that *Wilson* required that Montana law be applied to determine the upper limit of the title to the bed and banks of the Big Horn. So applied, the State of Montana pointed out, would require that this limit be the low-water mark rather than the ordinary high water mark that we held was proper. In response to Montana's petition, the United States argued that federal common law determined the proper upper limit of the Big Horn bed and banks and that such common law should not borrow state law as its law as was done in *Wilson.* Under federal common law both the State of Montana and the United States agree that the bed and banks of the Big Horn would reach to the ordinary high water mark.

We confess to a certain amount of difficulty in determining the proper response to the State of Montana's argument. Under *Wilson* the adoption of state law as a part of federal common law requires considering . . . whether there is need for a nationally uniform body of law to apply in situations comparable to this, whether application of state law would frustrate federal policy or functions, and the impact a federal rule might have on existing relationships under state law. We have considered these factors and have concluded, albeit less confidently than we would like, that state law should not be adopted as the federal common law in this case.

Our consideration of whether a nationally uniform law is needed yields uncertainty.

The United States argues that a nationally uniform rule is needed because of the vast amount of lands held in trust for Indians that it administers. We are not entirely convinced that these responsibilities necessitate rejection of *Wilson's* adoption of state law.

Such rejection, however, very well may prevent frustration of "federal policy and functions." We reach this conclusion because of the particular history of the allotments of riparian land on the Crow Reservation. Almost all such land, the United States asserts and the State of Montana does not deny, was initially allotted to Indians who, in some instances, later sold to non-Indians. Under these circumstances, it is natural to assume, the United States argues, that federal common law alone should fix the boundary between the bed and bank of the Big Horn River, which was held in trust for the Crow Tribe, and riparian land originally allotted to individual Indians. This argument has force.

Many years ago this court observed:

The general rule, of course, is that patents of the United States to lands bordering navigable waters, in the absence of special circumstances, convey only to high water mark.

*Montana Power Co. v. Rochester,* 127 F.2d 189 (9th Cir. 1942). We know of no reason why that principle was not applicable to the patents of the riparian land involved in this case. To adopt at this late date a different rule very likely would frustrate the intention of the United States in granting the patents. This can be described, we think, as frustration of "federal policy and functions."

■ Finally, we are not convinced that failing to adopt Montana law as federal common law will impact harmfully on existing relationships under state law. It is true it may have been thought by some riparians that the State of Montana owned the bed and banks of the Big Horn and that Montana law fixed the limits of riparian title. When the assumption regarding the title to the Big Horn is removed, however, there is much less reason to expect that state law

will fix those limits. In any event, to assume that the State of Montana owned the bed and banks of the Big Horn was to assume something not then established by law.

On balance, therefore, we decline to alter the view we expressed in our original opinion, *viz.*, that title to the bed and banks of the Big Horn extends to the ordinary high water mark.